**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 06-20976-CIV-MORENO/TORRES

PLATYPUS WEAR, INC., a California
corporation,

       Plaintiff,

v.

CLARKE MODET & CO., INC., a Florida
corporation; CLARKE, MODET AND
COMPANY, S.L., a foreign corporation,

       Defendants.

_____/

**ORDER DENYING DEFENDANTS'**
**MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY**
**OF PLAINTIFF'S PROFFERED EXPERT WITNESS ANTONIO L. ARGIZ**

     This matter is before the Court on Defendants' *Daubert* Motion *in Limine* to

Exclude the Testimony of Plaintiff's Proffered Expert Witness Antonio L. Argiz [D.E.

479]. After considering the arguments raised in the motion, Plaintiff's Response [D.E.

482] and Defendants' Reply [D.E. 490], the Court concludes that Antonio L. Argiz

("Argiz") may testify as an expert in the area of lost profit and damage analysis as his

expert opinions are legally admissible at trial. As such, Defendants' Motion to Exclude

the Testimony of Plaintiff's Proffered Expert Witness Antonio L. Argiz must be denied

for the reasons fully set forth below.

## I.  BACKGROUND

Plaintiff Platypus Wear, Inc. ("PWI") is a trademark licensing company that claims ownership of several "Bad Boy" power drink images.  In its Amended Complaint, PWI seeks remedies for, *inter alia,* conversion, fraud, conspiracy to commit fraud and legal malpractice allegedly committed by agents of Defendant Clarke, Modet and Co., S.L. and its Florida subsidiary Clarke Modet and Co. Inc. ("Clarke Modet"). Clarke Modet is a professional services firm that offers intellectual property services to clients around the world.

Prior to the filing of this action, PWI sued its Brazilian licensee Big Blue Comercio Ltda. ("Big Blue") in a Brazilian Federal Court for allegedly misusing PWI's "Bad Boy" images in violation of their 1998 Licensing Agreement (the "1998 agreement").  On or about July 2003, the Brazilian Court granted PWI an injunction preventing Big Blue from using the "Bad Boy" trademark pending a resolution of that lawsuit.  Clarke Modet represented PWI in those proceedings.

On June 25, 2003, while the Brazilian litigation against Big Blue was still pending, a California court enjoined Laurens Offner from acting as PWI's President and controlling shareholder due to his wrongful acquisition of control of the company (the "California injunction").

PWI alleges that the events that caused this litigation to unfold occurred during a meeting in Miami (the "Miami meeting") on July 12, 2003.  According to PWI, Laurens Offner met with PWI's then-lawyer Elisa Santucci from Clarke Modet,

representatives from Horizonte,[1] and representatives from Big Blue. This meeting took place after the entry of the California injunction on June 27, 2003. PWI further alleges that the participants of the Miami meeting executed four agreements that surreptitiously settled the Brazilian litigation regarding the 1998 Licensing Agreement. Additionally, these agreements provided that (a) PWI would transfer the "Bad Boy" trademarks to Big Blue, (b) Big Blue would transfer certain "Bad Boy" trademarks to Horizonte, (c) Big Blue would pay 50% of any future income relating to the "Bad Boy" trademarks to Laurens Offner, and (d) Laurens Offner would have veto authority over Horizonte's use of the trademarks. PWI claims that these agreements were fraudulent because Laurens Offner did not have the authority to represent PWI as a result of the California injunction issued two weeks earlier.

The Amended Complaint further alleges that Elisa Santucci, acting as an agent of Defendant Clarke Modet, backdated the Miami agreements to April 24, 2003 in order to avoid the June 27, 2003 California court ruling. Upon discovering the fraudulent nature of these agreements, PWI was forced to negotiate a new licensing agreement with Big Blue under substantially unfair bargaining conditions. In August 2004, PWI and Big Blue reached an agreement under which Big Blue received an exclusive 10-year master license for use of the "Bad Boy" brand in Brazil. Additionally, Big Blue returned to PWI the "Bad Boy" trademarks and other intellectual property that it claimed under the allegedly fraudulent Miami agreements. PWI claims that in

---

[1]     Horizonte is owned and operated by Defendants Fernando Caldas Pereira Caldas, Sr., Fernando Maria Agostinho Pereira Caldas, Jr., Roberto Silva Ramos; Frederico de Carvalhao Marques D'Orey Menano and Antonio Manuel Pereira Caldas Castro Henriques. It produces and distributes beverages and related products. Since 2001, Horizonte has used Plaintiff's "Bad Boy" trademarks for its products.

exchange for returning PWI's intellectual property, Big Blue extracted substantial discounts in royalty rates it would pay for the use of PWI's intellectual property on clothing in Brazil.

In this action PWI is essentially attempting to recover damages from Clarke Modet on both the 1998 and the 2004 agreements. PWI's theory of recovery on the 2004 agreement rests on the premise that PWI, unaware of the fraudulent nature of the Miami agreements, entered into a discounted agreement with Big Blue. PWI contends that the only reason PWI agreed to such discounted terms was to avoid further financial losses that would have resulted from continuing enforcement of the Miami agreements.

PWI retained Antonio L. Argiz as an expert to calculate its lost profits and damages [D.E. 434 Exhibit A]. In his initial damages scenario, Mr. Argiz made two separate damage analyses under the two separate contracts [D.E. 434 Exhibit A at 3-4]. First, in order to calculate the damages resulting from PWI being forced to waive its claims against Big Blue for its breach of the 1998 license agreement, Mr. Argiz calculated the present value of the difference between the minimum guaranteed royalties that Big Blue was contractually obligated to pay to PWI and the actual payments received by PWI during the life of that contract.

Second, in order to calculate the damages resulting from PWI being forced to enter into a discounted master license agreement in August 2004, Mr. Argiz calculated the present value of the difference between what PWI has received under the 2004 master license agreement and what it would have received under a standard rate

agreement.  Mr. Argiz calculated 40% to be the standard rate by analyzing other similar licensing agreements between PWI and its master licensees.

Mr. Argiz also calculated two alternative scenarios regarding damages against Big Blue under the 2004 agreement.  The second scenario assumed that PWI replaced Big Blue with another master licensee [D.E. 434 Exhibit A at 4-5].[2]  The third scenario assumed that PWI replaced Big Blue with a sub-licensing agent [D.E. 434 Exhibit A at 5-6].  In other words, this scenario eliminated the "middle man" and assumed that PWI would undertake marketing and creative resources expenses for itself.  Finally, in scenario number four, Mr. Argiz calculated damages against Horizonte.[3]  These damages were based on Horizonte's estimated 2005 revenues from products utilizing PWI's trademarks.

Defendants now assert in their motion that Mr. Argiz's opinions do not meet the *Daubert* standard of reliability and should be excluded.  Specifically, Defendants point out that, in determining the amount of royalties actually received under the 1998 agreement, Mr. Argiz relied only on PWI's 1998 and 1999 royalty income ledgers for Big Blue.  Mr. Argiz purportedly never verified this data by checking bank statements, financial records, invoices or tax returns.  Additionally, Defendants argue that Argiz erroneously assumed that the 1998 agreement between PWI and Big Blue was enforceable under the Brazilian law.

---

[2]  Damages under the second scenario are almost identical to the amount calculated under the 2004 agreement in the first scenario.

[3]  According to Plaintiff, Big Blue fraudulently transferred certain PWI's "Bad Boy" trademarks to Horizonte as a part of the 2003 Miami agreement.

Defendants also attack Mr. Argiz's 40% royalty rate used in damages calculations under the 2004 agreement. Defendants challenge Mr. Argiz's findings, claiming that Mr. Argiz failed to review and analyze all of PWI's licensing agreements when calculating the rate. Additionally, Defendants criticize the 40% royalty rate due to PWI's willingness to renegotiate the 2004 agreement with Big Blue for a much lower rate, even after learning about the alleged fraudulent nature of the Miami agreements. Defendants also point out that, during the renegotiation of the 2004 agreement, Big Blue clearly indicated to PWI on numerous occasions that it would never agree to a 40% rate. Accordingly, Defendants argue that Mr. Argiz's calculation utilizing such rate is simply inaccurate and should be excluded.

With respect to scenarios two and three, Defendants assert that Mr. Argiz's calculations are unreliable because they assume that PWI would have replaced Big Blue with another master licensee or a sub-licensee agent. Defendants base this assertion on PWI's continuous willingness to renegotiate the 2004 agreement with Big Blue. According to Defendants, Mr. Argiz's calculations are "demonstrably false" because PWI never attempted to replace Big Blue with another master licensee or a sub-licensee agent, despite having an opportunity to do so.

Finally, Defendants challenge damages against Horizonte calculated in scenario four. Once again, Defendants argue that Mr. Argiz did not verify the accuracy of the data he utilized in his calculations.

## II.  ANALYSIS

When faced with a proffer of expert testimony under Rule 702, the party offering the expert testimony carries the burden of laying the proper foundation, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, the trial court must function as a gatekeeper and engage in a three-part inquiry to determine whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *E.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)). The Eleventh Circuit has referred to these requirements as the "qualifications," "reliability," and "helpfulness" prongs and, although there is inevitably some overlap, they remain distinct concepts that must be individually analyzed. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

The Court's analysis must keep in mind that "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) ("A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'") (quoting *Allison*, 184 F.3d at 1311). "Quite the contrary, 'vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Technology*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

Defendants here do not take issue with the concept that expert testimony may be required in this case to assist the fact finder in determining the amount of lost profits and damages. Additionally, Defendants never question Argiz's qualifications as a damages expert. Thus we will only address the "methodology" prong of the *Daubert* test.

In determining the reliability of an expert opinion, the Court considers:

(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Technology*, 326 F.3d at 1341 (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). This list of factors, however, does not exhaust the different considerations that may bear on the reliability of an expert opinion. *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). "A federal court should consider any additional factors that may advance its Rule 702 analysis." *Id.* Some of those factors may apply in a given case, while others may not. "Whether the *Daubert* opinion factors are even pertinent to assessing reliability in a given case will depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire*, 526 U.S. at 150). Expert testimony must be excluded if the reasoning or methodology underlying the opinion is scientifically invalid, or if the

methodology cannot properly be applied to the facts. *Daubert*, 509 U.S. at 592. Unless an expert's testimony is "so fundamentally unreliable that it can offer no assistance to the jury, . . ., the factual basis of the testimony goes to the weight of the evidence." *Larson v. Kempker*, 414 F.3d 936, 940-41 (8th Cir. 2005).

Because this *Daubert* motion pertains to calculation of damages, it is important to point out that "while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *G.M. Brog & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985). "The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974).

Defendants' main challenge to Mr. Argiz's testimony is his failure to verify the accuracy of various data, such as PWI's royalty income ledgers for Big Blue or Horizone's forecast sales, before utilizing them in generating his report. Yet contrary to Defendants' assertion, an expert witness is not a private investigator hired to investigate the accuracy of each report or document he uses in creating his report. Instead, the documents or data an expert witness utilizes must only be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Surely, a company's forecast sales or income ledgers fall under this umbrella. By challenging the accuracy of the documents used by Mr. Argiz, Defendants ask this Court to adopt their interpretation of the record as grounds for exclusion. But rather than supporting a basis for exclusion, Defendants'

arguments are far more appropriate for cross-examination and impeachment of Mr. Argiz.  They are not enough for the Court to deem the expert's conclusions inadmissible as a matter of law under Rule 702.

None of the cases cited by Defendants in support of their position have much bearing on the question of admissibility of Mr. Argiz's report.  Most of the cited cases pertain to highly distinguishable situations where expert witnesses relied exclusively on documents prepared by plaintiff's counsel for the purpose of litigation.  Naturally, those types of documents are inherently unreliable due to the substantial likelihood that self-interest.

Additionally, unlike Mr. Argiz's expert report that pertains to pure economic calculations, the cited cases address the reliability of a medical expert witness merely interpreting records to assess a patient's condition.  Those courts have refused to allow physicians to render an expert opinion about an individual's medical condition if the only basis for their testimony is review of another physician's report.  *In re TMI Litg.*, 193 F.3d 613, 697-98 (3d Cir. 1999) (expert witness relying on medical summaries of patients made in preparation of litigation); *Crawley v. Chait*, 322 F. Supp. 2d 530, 546 (D.N.J. 2004) (expert witness relying on summaries prepared by counsel); *see also Lyman v. St. Jude Medical S.C., Inc.*, 2008 WL 2224352, *5 (E.D. Wis. May 27, 2008) (in calculating future sales, Defendant's expert witness erroneously relied on only the sales summaries provided by Defendant's counsel).

Unlike documents and reports in the previously cited cases, Horizonte's forecast sales report was not generated by PWI's counsel or prepared in anticipation of litigation.  Additionally, Horizonte is a party adverse to PWI in two different court

proceedings. PWI has accused Horizonte of participating in a scheme to defraud. Its agents or employees would ordinarily not have an incentive or self-interest to skew sales data or projections in favor of PWI. Therefore, the Court finds that Horizonte's forecast sales prediction possesses sufficient indicia of reliability to justify Mr. Argiz's reliance on it in his report. And again Defendants can challenge those projections at trial as having been based on speculation or guesswork.

Defendants also contend that Mr. Artiz's report should be excluded due to its faulty assumption that the 1998 Licensing Agreement was enforceable under Brazilian trademark law. Defendants contend that Mr. Artiz's erroneous assumption renders his entire methodology invalid. Defendants' reasoning, however, puts the cart before the horse. The enforceability of the 1998 agreement and PWI's right to collect damages under it may be one of the issues decided at trial. Ultimately, every expert witness who calculates damages sustained from a breach of a given contract must assume the contract's enforceability under the law. An accountant or forensic expert would not be expected or allowed to render an underlying legal opinion on that issue.

That limitation in his testimony may also be raised on cross-examination to discount the effect of the opinion. If, as Defendants contend, it will be established that PWI has no right to recover under the 1998 agreement, Mr. Argiz's damages analysis that pertains to the 1998 agreement may simply be stricken or rendered moot. A *Daubert* motion is an improper vehicle in the proceedings to adjudicate the validity of a given contract or the legal premise of the expert's opinion. Therefore, the Court finds Mr. Argiz's assumption as to the enforceability of the 1998 Licensing Agreement was quite permissible and customary under the circumstances.

Next, the Court finds no merit in Defendants' challenge to the accuracy of 40% standard royalty rate calculated by Mr. Argiz.   First, we are not convinced by Defendants' assertion that Mr. Argiz had a duty to review every PWI's licensing agreement before determining the standard rate.   The number of licensing agreements reviewed by Mr. Argiz in determining the 40% standard rate goes to the weight of the evidence and not its admissibility.   At trial, Defendants will have an ample opportunity to challenge the 40% rate during their cross-examination of Mr. Argiz.   *See, e.g., U.S. Information Systems, Inc. v. International Broth. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (small size of data sample used by expert to show anti-competitive effects of alleged antitrust conspiracy went to weight, rather than admissibility).

Second, Defendants assert that the 40% standard rate is clearly excessive because, during the re-negotiations of the 2004 agreement, Big Blue representatives indicated their unwillingness to agree on such a high rate.   Also, Defendants point out that PWI's willingness to re-negotiate the 2004 agreement and its agreement on a lower rate are other indicators of the excessiveness of a 40% rate.

There are, however, many flaws in Defendants' argument.   The main objective of Mr. Argiz's report is to calculate the damages that PWI sustained as a result of the allegedly fraudulent transactions in 2003.   Contrary to Defendants' assertion, the objective is not to determine maximum rate that PWI could have obtained in their licensing agreement with Big Blue.   The determinative factor in calculating post-2003 damages is the value of fraudulently transferred "Big Boy" trademarks in 2003, with or without Big Blue in the picture.   Thus, the fact that Big Blue was never willing to

agree on a 40% rate has no dispositive bearing on the calculation of damages in this case. Similarly, the fact that PWI continued to re-negotiate the 2004 agreement with Big Blue is also not dispositive. There are numerous possible reasons why PWI continued to negotiate with Big Blue, none of which may have any bearing on calculation of post 2003-damages.

Finally, Defendants challenge Mr. Argiz's factual foundation for computing a 15% sub-licensee royalty rate used in scenario three. Defendants claim that Mr. Argiz's only source for a 15% rate was information provided by Nair Alfonso, the financial director of Big Blue. However, as is the case with the previously addressed Horizonte sales, data used by Mr. Argiz to calculate the 15% rate was not created by Plaintiff's counsel solely for litigation purposes. Instead, Mr. Argiz relied on presumptively real world information provided by a party with a potential adverse interest to that of PWI. Therefore, Mr. Alfonso's statement was sufficiently reliable for Mr. Argiz to use it in his determination of sub-licensee royalty rate.

Again, that statement can be challenged or impeached at trial. Defendants can, for instance, question its veracity based upon whatever supporting documents are or are not introduced at trial by PWI. Similarly, they can undermine their reliability if Big Blue's representatives do not testify at trial. Defendants indeed have strong points to make on cross-examination and at trial regarding this data that Mr. Argiz relied upon. They can also serve as fodder for cross-examination of Mr. Argiz. But whether or not that is the case, the bottom line is that Defendants' many reasonable criticisms of Mr. Argiz's analysis must be weighed and considered by a jury at trial, and not

excluded from the trier of fact's consideration as a matter of law under the guise of the Court's Rule 702 gatekeeping function.  *See Quiet Technology,* 326 F.3d at 1341.

The Court concludes in the end that Mr. Argiz's testimony is not so fundamentally unreliable that it must be precluded because it can offer no assistance to the jury.  The factual basis of Mr. Argiz's testimony more appropriately goes to the weight of the evidence, and not to its legal admissibility.

### III.   CONCLUSION

For the reasons stated above it is hereby, **ORDERED AND ADJUDGED** that Defendants' *Daubert* Motion *in Limine* to Exclude the Testimony of Plaintiff's Proffered Expert Witness Antonio L. Argiz [D.E. 479] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of October, 2008.

    /s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge